

**SIGNED this 14th day of November, 2017**

_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

In re:

No. 1:16-bk-12562-SDR
Chapter 7

Barry Ray Elrod and
Emily Suzanne Elrod,

      Debtors;

Jerrold D. Farinash, Trustee,
      Plaintiff

v.

Adversary Proceeding
No.   1:17-ap-1016-SDR

UpRight Law, LLC,
Law Solutions Chicago, LLC, and
Ron Smith

      Defendants

1

*Appearances for the Plaintiff, Jerrold D. Farinash, Trustee*

        Jerrold D. Farinash
        Farinash & Stofan
        100 West MLK, Suite 816
        Chattanooga, TN 37402

        Amanda M. Stofan
        Farinash & Stofan
        100 West MLK, Suite 816
        Chattanooga, TN 37402

*Appearances for the Defendant, Ron Smith*

        Harry R. Cash
        Grant, Konvalinka, & Harrison
        Suite 900 Republic Centre
        633 Chestnut St.
        Chattanooga, TN 37450

# MEMORANDUM

On May 22, 2017, Jerrold D. Farinash, the duly appointed chapter 7 Trustee ("Trustee" or "Plaintiff") filed this adversary proceeding against defendants UpRight Law, LLC ("UpRight Law"), Law Solutions Chicago, LLC ("LSC"), and Ron Smith ("Mr. Smith") (collectively "Defendants"). [Doc. No. 1, Complaint 1].[1] Plaintiff's complaint against Mr. Smith, who is alleged to have been acting in the scope of his employment with UpRight Law and LSC, contains two claims for relief: (1) unauthorized practice of law under Tennessee Code Annotated § 23-3-103; and (2) negligence per se based on a violation of the unauthorized practice of law statute.[2] [Doc. No. 1, at 13-17].

On September 13, 2017, Mr. Smith through counsel filed a special appearance motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012. [Doc. No. 19]. On September 29, 2017, Plaintiff filed a response. [Doc. No. 23]. The parties filed additional supplemental briefing [Doc. Nos. 29, 32], and on November 1, 2017, the court heard oral argument on the motion to dismiss.

Mr. Smith argues for dismissal based on the following grounds:

1. The court lacks personal jurisdiction over Mr. Smith.

2. Assuming the court has jurisdiction, Plaintiff has failed to plausibly allege any facts showing that: (a) Mr. Smith's conduct constituted the unauthorized practice of law; and (b) failed to allege a causal link between Mr. Smith's actions and the "loss" of the Debtors' house.

---

1 All docket references are to this adversary proceeding unless otherwise indicated.
2 The Plaintiff alleges a third cause of action, professional negligence, against only UpRight Law and LSC. [Doc. No. 1, at 16].

3. Plaintiff has failed to allege properly facts showing that either he or the Debtors satisfy the two threshold questions required for negligence per se. Neither Plaintiff nor the Debtors belong to the class of persons that the statute was designed to protect or have suffered an injury as a result of Mr. Smith's actions. [Doc. No. 20, at 2-3].

As discussed in more detail below, the court finds that it has personal jurisdiction over Mr. Smith in this case and that he is not entitled to dismissal of these claims. Therefore, the court will DENY the motion to dismiss filed by Mr. Smith. [Doc. No. 19].

## I.    Factual Allegations[3]

Plaintiff's complaint alleges that Defendant LSC is an Illinois company authorized to transact business in Illinois under the active assumed name of, *inter alia*, UpRight Law, LLC. [Doc. No. 1, at ¶ 4]. LSC was domesticated in Tennessee on February 27, 2014. [*Id.* at ¶ 5]. Its principal address is in Chicago, Illinois, and its registered agent address is in Brentwood, Tennessee. [*Id.*].

On June, 6, 2016, Barry Elrod contacted UpRight Law via telephone for an initial consultation regarding a foreclosure listing on his real estate located at 432 Sullivan Rd., McMinnville, Tennessee 37110. [*Id.* at ¶ 10]. This phone call was recorded. [*Id.*]. After providing his basic information, including the reason for his call, Mr. Elrod was transferred to "Ron Smith," a "Senior Consultant" at UpRight Law, to assess his situation. [*Id.* at ¶¶ 7, 11]. The consultation with Mr. Smith lasted for 67 minutes, and this call was also recorded. [*Id.* at ¶¶ 11, 12].

Mr. Elrod explained that a foreclosure of his home was scheduled for June 28, 2016, and that he was never notified by the mortgage lender about the foreclosure. [*Id.* at ¶ 12(a)]. Mr. Elrod

---

3  The court has limited its recitation of the factual allegations to those relevant to the claims against Mr. Smith.

also stated that he was two years behind on his real property taxes. [*Id.*]. Mr. Elrod explained on numerous occasions that his local mortgage lender told him that a payment of $1,000 would bring his mortgage current. [*Id.* at ¶ 12(b)]. He repeatedly asked for advice about whether he should bring his mortgage current by making the $1,000 payment or file for bankruptcy. [*Id.*]. He explained that he did not want to lose his house because he has two children and that he was the only person earning income in his household. [*Id.*].

Mr. Smith stated that the Elrods "would have to file what we call a Chapter 13, which will restructure your debt through a payback plan where you are paying back a percentage over sixty months." [*Id.* at ¶ 12(c)]. Mr. Smith also stated that the Elrods could stay in their home if they filed a chapter 13. [*Id.*].

On numerous occasions, Mr. Smith stated that the Elrods' case would be a "rush" case and that the attorneys at UpRight Law would "ask for nothing less than $2,260 to file the case." [*Id.* at ¶ 12(d)]. When Mr. Elrod explained that he made $400 a week and could not pay $2,260, Mr. Smith responded that he needed to find a way to come up with $2,260. [*Id.*]. Mr. Smith also told Mr. Elrod that he should have filed for bankruptcy after he was one month behind on his mortgage. [*Id.*]. When Mr. Elrod asked whether the pre-petition attorney fee could be added to the chapter 13 payment, Mr. Smith stated that could not happen because an additional $2,000 was already to be included in the chapter 13 plan for a total fee of around $4,000. [*Id.*]. Mr. Smith told Mr. Elrod that he did not want too many fees in the chapter 13 payment because Mr. Elrod would not be able to make the payment. [*Id.*]. Mr. Smith then put Mr. Elrod on hold so that he could ask an attorney if they could lower the fee. [*Id.*]. Mr. Smith told Mr. Elrod that he "fought and went to bat for him" and that they could file the case if he made a payment of $2,060 (a $200 discount from the

previously quoted fee of $2,260). [*Id.*]. Mr. Smith stated that $1,500 had to be paid by Friday (June

10) and suggested that Mr. Elrod get someone else to help him pay the fee. [*Id.*]. Mr. Smith stated

that UpRight Law would start the bankruptcy process for an immediate payment of $50 (i.e., on

June 6), a $1,450 payment on Friday, June 10, and the remaining $560 before June 22. [*Id.*].

Mr. Elrod stated his desire to stop the foreclosure that day. [*Id.* at ¶ 12(e)]. Mr. Smith

responded that "nothing in the world will be able to stop this today, period, because that is just the

situation you are in. You don't pay it like in a second and it stops. It is a process." [*Id.*]. Mr. Smith

then told Mr. Elrod that he had to pay $2,060 before June 22 before they could file the case. [*Id.*].

Mr. Elrod noted that UpRight Law is in Chicago and asked if they had attorneys in his area.

[*Id.* at ¶ 12(f)]. Mr. Smith stated that they have attorneys all across the United States and most of

their attorneys have 20-30 years plus of experience and have done bankruptcies all across the

United States. [*Id.*].

Mr. Elrod asked about which debts he could include in the bankruptcy. [*Id.* at ¶ 12(g)]. Mr.

Smith stated that he could put everything in the bankruptcy and asked about the Elrods' debts.

[*Id.*]. Mr. Elrod reported that his unsecured debt was around $4,000 and that his Jeep had recently

been repossessed. [*Id.*]. Mr. Smith asked about Mr. Elrod's mortgage, including the arrearage and

monthly payments. [*Id.* at ¶ 12(h)]. Mr. Elrod told him that the monthly payments were $345. [*Id.*].

Mr. Smith asked if the home was a double-wide, and Mr. Elrod responded that his home was a

full-sized house and not a double-wide. [*Id.*]. Mr. Smith then determined that Mr. Elrod was only

behind on his mortgage by $1,000. [*Id.*].

Mr. Smith explained the typical foreclosure process and asked for the address of the home.

[*Id.* at ¶ 12(i)]. Mr. Elrod provided the address, and after apparently reviewing a database, Mr.

Smith stated that Mr. Elrod's home was not on the market and was not being sold. [*Id.*]. Mr. Elrod explained that the foreclosure was listed in the newspaper for auction on June 28, at 10:00 a.m. [*Id.*]. Mr. Elrod stated that the payoff was $69,000. [*Id.*]. Mr. Smith told him that there was no equity in the house and that it appeared that $1,000 would catch up the mortgage. [*Id.*]. Mr. Elrod agreed and specifically asked whether he should pay the mortgage and/or file bankruptcy. [*Id.*]. Mr. Smith stated that if Mr. Elrod paid the $1,000, the house would not be sold. [*Id.*]. Mr. Elrod then explained that he owed real property taxes of $305 a year for at least the last two years. [*Id.*]. Mr. Smith responded that Mr. Elrod was going to have to file a chapter 13 and "there [was] no point in paying" the $1,000 to the mortgage company since Mr. Elrod owed real property taxes. [*Id.*].

Mr. Smith asked about Mr. Elrod's income, children, checking account, vehicles, and other assets. [*Id.* at ¶ 12(j)]. Mr. Smith stated that the Elrods' chapter 13 payment would be around $483 a month, including the repossessed Jeep, plus the mortgage payment of $345 a month. [*Id.*]. Mr. Smith advised that the payments could be weekly, bi-weekly, or monthly, but that $483 would be needed to "save the house." [*Id.*]. Mr. Smith also explained that the mortgage arrearage of three months would be included in the bankruptcy and that the chapter 13 trustee payment would be used to pay a percentage to the other creditors. [*Id.*]. Mr. Smith stated that this was "what [would] allow [the Elrods] to stay in the house." [*Id.*].

Mr. Smith again repeated his offer to start the process for an immediate payment of $50 (June 6), another $1,450 on Friday, June 10, and $560 on June 22 to get this "assigned to some local attorneys." [*Id.* at ¶ 12(k)]. He then stated, "[W]e get a case filed, get you into Court, get this debt all wrapped up to where you are paying that amount each month and then, umm, that is it. So

that thousand dollars, just use that for the bankruptcy because it doesn't matter if you pay that.

They are still going to take the house anyway. Really, all you need to pay on is the bankruptcy."

[*Id.*].

Mr. Elrod asked whether or not he would get the Jeep back. [*Id.* at ¶ 12(l)]. Mr. Smith asked

how long ago the Jeep had been repossessed, and Mr. Elrod responded that it had been

approximately two weeks. [*Id.*]. Mr. Smith replied:

> [T]hat's impossible then, because you can only get a repossession back ten days
> after it has been repossessed in the state of Tennessee. So, if it has been two weeks,
> about fourteen days, that's impossible. But that debt on that Jeep will be
> restructured to where you are only paying back a small percentage because what
> they will do is sell the vehicle and charge you with the difference.

[*Id.*]. Mr. Elrod asked whether he would owe the full amount due for the Jeep or the amount left

over after the sale of the Jeep. [*Id.*]. Mr. Smith, after checking with someone else at UpRight Law,

responded that Mr. Elrod would only be responsible for paying the difference after the sale and that

Mr. Elrod would only have to pay a percentage of the difference. [*Id.*]. Mr. Elrod asked about the

percentage, and Mr. Smith stated that in a chapter 13 you "pay back a percentage of your debt, so

only pay back a percentage of the difference." [*Id.*].

Mr. Smith then stated that "the main thing here is to get the house, umm, stop the house

from being foreclosed on and once the $2,060 is paid, we put an automatic stay on the house so that

way they can't foreclose on it or they can't sell it." [*Id.* at ¶ 12(m)]. Mr. Smith repeated his offer

related to the payments for $2,060, including, "even if you have to borrow the money from

someone." [*Id.*]. Mr. Elrod asked whether the house could be sold if he paid UpRight Law $2,060

and Mr. Smith responded "that is correct." [*Id.* at ¶ 12(n)]. Mr. Smith explained further that, "once

the $2,060 is paid, we are going to put an automatic stay on there, they can't sale [sic] the house.

That's the bottom line. That's how it works." [*Id.*]. Mr. Smith explained:

> [I]f you don't do this, they're going to take the house, they're going to charge you
> with the difference on that as well, and they're going to charge you with the
> difference on the vehicle. It's going to be a complete thunderstorm and they're to
> do things like garnish your check, it's going to be a lot worse, they're going to do
> things like garnish your check, take 25% of whatever you [sic] bringing in, and
> make you pay back something you don't even have anymore. That's what can
> happen, that's what will happen actually, not can happen. That's what will happen
> if you don't get this done."

[*Id.* at ¶ 12(o)].

Mr. Elrod responded that he wanted to proceed and provided Mr. Smith with a Visa debit

card number for the $50 payment. [*Id.* at ¶ 12(p)]. Mr. Smith told Mr. Elrod "we are going to do a

petition." [*Id.*]. Mr. Smith stated that:

> [W]hen you get the contract in agreement form, so [sic] are going to see something
> on there that says, umm, post-filing fees pretty much, those are put into your
> bankruptcy, which I already calculated into the trustee amount. So that is not an
> amount you have to pay upfront to get the case filed. Just so you don't get confused.

[*Id.*]. Mr. Smith then asked Mr. Elrod for certain types of contact information, including his date of

birth, social security number, prior divorces, child support obligation, dependents, employment

status, income, vehicles, mortgage information, bank account information, retirement and life

insurance information, transfers of assets, and real property tax delinquency. [*Id.* at ¶ 12(q)].

After a conversation about Mr. Elrod's debt to Advance America for a check loan whereby

the payments to Advance America were scheduled for an automatic debit, Mr. Smith rapidly read a

set of apparently scripted statements. [*Id.* at ¶ 12(r)]. At the end of each statement, Mr. Smith asked

if Mr. Elrod agreed. [*Id.*]. Mr. Elrod responded to each statement that he agreed. [*Id.*]. The

statements included the following representations: (i) Mr. Smith and Mr. Elrod discussed the

9

Elrods' options to file a chapter 7 bankruptcy; (ii) Mr. Smith and Mr. Elrod discussed

non-bankruptcy alternatives; and (iii) UpRight Law is a nationwide firm.

Mr. Elrod next asked about how long the bankruptcy would stay on his credit report and

when his credit score would go back up. [*Id.* at ¶ 12(s)]. Mr. Smith told him that he could build up

his credit in the chapter 13 by making payments to the trustee and that fresh start loans were

available to build credit. [*Id.*]. Mr. Smith also told him that the bankruptcy would stay on his credit

report for sixty months. [*Id.*]. Mr. Smith then concluded the telephone call. [*Id.* at ¶ 12(t)].

Sometime later, Mr. Smith spoke with Mr. Elrod again about an email exchange. [*Id.* at ¶

13]. During this call, Mr. Elrod asked Mr. Smith if he could file the case sooner. [*Id.*]. Mr. Smith

responded that the case could be filed sooner if the payments were made sooner. [*Id.*]. Mr. Elrod

then asked about the reliability of UpRight Law. [*Id.*]. Mr. Smith declared:

> We are the biggest bankruptcy law firm in the U.S. In rush cases like this, we are
> pretty much probably one of the best firms you need to be going with because a lot
> of attorneys are hard to get a hold of and you gotta sit down and meet with them and
> do all this stuff. By the time all that's done, everything is already gone and it's too
> late to file a case. With us, we have more than one person handling it, there is [sic]
> multiple people handling your case. That's why we are going to get it done pretty
> fast.

[*Id.*]. Mr. Elrod also expressed concern about the over-the-phone and over-the-internet part of the

process. [*Id.*]. Mr. Smith responded:

> It's 2016. That is how we are able to get everything done fast, you know, you don't
> have time to be meeting and filling out hours and hours of paperwork. Your stuff is
> going to get taken away. This is a rush case. If you do it online and get things going
> moving forward and push it over to an attorney, through the system we use, the
> petition is already there. You don't have to going in and fill out all this paperwork.
> You know what I am saying. We can get it done in the press of a button. So this is a
> benefit for you."

[*Id.*].

10

Mr. Elrod again expressed his concern about paying for things over the internet. [*Id.*]. Mr. Smith responded that "you are paying for federal fees, like the court filing fee." [*Id.*]. Mr. Smith concluded the telephone call by stating that Mr. Elrod should be receiving emails from UpRight Law soon. [*Id.*].

On June 9, 2016, Mr. Elrod spoke to an attorney, Josh Laker ("Mr. Laker"), at UpRight Law. [*Id.* at ¶ 14]. Mr. Laker went over the requisite information regarding a chapter 7 and chapter 13 bankruptcy, the mortgage arrearage, saving Mr. Elrod's home from the pending foreclosure, the effect of the automatic stay, assets, income, transfers, lawsuits, and garnishments. [*Id.*]. Mr. Laker explained that UpRight Law is a virtual law firm with attorneys and legal assistants in Chicago to help Mr. Elrod, but with local partner attorneys to assist with the process. [*Id.*]. Mr. Laker advised Mr. Elrod that he should not incur any new debt. [*Id.*]. He disclosed that the total attorney's fee would be $3,310, including $2,060 in pre-petition fees and $1,250 in post-petition fees that would be included in the chapter 13 plan. [*Id.*]. Mr. Laker also advised Mr. Elrod that UpRight Law would begin to bill against the fees Mr. Elrod had paid to date for the time put into the Elrods' case because UpRight Law does not "do full refunds." [*Id.*]. Mr. Laker concluded the telephone call by stating that he would send Mr. Elrod a retainer agreement. [*Id.*]. Plaintiff alleges that Mr. Laker was not and is not licensed to practice law in Tennessee. [*Id.*].

On June 9, 2016, Mr. Elrod paid $2,010 to UpRight Law via his Visa debit card. [*Id.* at ¶ 15]. On June 10, 2016, Mr. Elrod contacted Mr. Laker at UpRight Law. [*Id.* at ¶ 16]. Mr. Laker told Mr. Elrod that attorney Nick Kessler ("Mr. Kessler") would be his local representative and would be contacting him soon about his bankruptcy case. [*Id.*]. Mr. Elrod reported that Mr. Kessler recently left him a voicemail. [*Id.*]. Mr. Laker told him that he was going to begin "building" the

Elrods' bankruptcy petition, and he asked a number of questions for information to include on the

petition. [*Id.*].

On June 10, 2016, Mr. Elrod contacted Mr. Smith and stated that Mr. Kessler would not

agree to represent the Elrods due to the short timeframe involved in filing a bankruptcy before the

foreclosure. [*Id.* at ¶¶ 17, 29(k)-(l)]. Mr. Smith stated that they may be able to get the Elrods a new

attorney. [*Id.* at ¶ 17]. Mr. Smith further stated that they did rush cases all the time and that

someone would be contacting Mr. Elrod. [*Id.*]. Mr. Elrod told Mr. Smith that Mr. Kessler had told

him that he was not qualified for the bankruptcy. [*Id.*]. Mr. Smith stated that "anyone can file a

chapter 13, pretty much." [*Id.*]. Mr. Elrod replied that Mr. Kessler told him that he made too much

money to file a bankruptcy. [*Id.*]. Mr. Smith responded "no, that's not true. That is the whole point

of filing a chapter 13 is if you make too much money." [*Id.*].

Mr. Elrod then received a telephone call from "George" at partner relations at UpRight

Law stating that the attorney assigned to the file was located in Chattanooga. [*Id.* at ¶ 18]. Mr.

Elrod responded that was going to be a big problem for him because he could not travel to

Chattanooga. [*Id.*]. "George" responded that he would see what he could do about assigning him to

a new attorney. [*Id.*].

On June 10, 2016, Mr. Elrod contacted Mr. Smith again about the status of finding him an

attorney. [*Id.* at ¶¶ 19, 29(m)]. Mr. Smith responded that they found an attorney "that is actually

better than the other attorney that is pretty good, really good actually and, umm, they are located in

Chattanooga. We are also able to take off $200 for you too as well. So we will refund you $200

back." [*Id.* at ¶¶ 19, 29(o)]. Mr. Elrod then inquired about the timeframe for meeting with the

attorney in Chattanooga because he was concerned about the drive time and whether or not the

attorney would take the case. [*Id.*]. Mr. Smith stated that he believed the attorney, whose name he

could not recall, was "a girl" and was ready to go. [*Id.*]. He said that she had been told about the

case and would take the case, and that "we can do cases usually we can get cases done in a couple

of days . . . ummm depending on the attorney. Our good attorneys are able to get them done in a

couple of days and she's one of our good attorneys so she'll be able to get this knocked out of the

park." [*Id.*]. Mr. Elrod also inquired about the E-sign email he received and was told to disregard it

since he had been assigned a new attorney. [*Id.*].

On June 13, 2016, the Elrods were contacted by attorney Layne Gillespie via email. [*Id.* at

¶ 20]. The complaint alleges that Ms. Gillespie, a member of the bar of this court and former

partner of UpRight Law, acted as an agent for the Defendants. [*Id.* at ¶ 8]. On June 21, 2016, the

Elrods physically met with Ms. Gillespie in her Chattanooga office and executed a retainer

agreement. [*Id.* at ¶ 21]. The complaint alleges that this was the first time the Elrods signed a

written contract with UpRight Law. [*Id.*].

On June 21, 2016, the Elrods commenced their bankruptcy case by filing a petition under

chapter 13 of title 11 of the United States Code. [*Id.* at ¶ 22]. Ms. Gillespie signed the Debtors'

bankruptcy petition on page 7 as their counsel. [*Id.* at ¶ 23]. Ms. Gillespie's signature block on the

petition indicated that she was filing their case on behalf of UpRight Law, LLC. [*Id.*].

On August 15, 2016, the Debtors' case was voluntarily converted to one under chapter 7.

[*Id.* at ¶ 28]. At the chapter 7 meeting of creditors held on September 14, 2016, the Debtors

testified regarding their interactions with UpRight Law [*Id.* at ¶ 29]. The Debtors stated that they

found UpRight Law on the internet, filled out an application, and submitted the application

through UpRight Law's webpage. [*Id.* at ¶ 29(b)]. Someone from UpRight Law sent the Debtor a

text message requesting the Debtor call a certain telephone number for UpRight Law. [*Id.* at ¶ 29(c)]. The Debtor spoke with someone at UpRight Law and told the individual that his home was in foreclosure and that it was scheduled in the newspaper. [*Id.* at ¶ 29(d)]. The individual from UpRight Law told the Debtor he would find someone for him within 24 hours and recommended a chapter 13 if the Debtor wanted to keep everything. [*Id.* at ¶ 29(e)]. The Debtor testified that he believes the individual from UpRight Law who recommended a chapter 13 was located in Chicago and was not an attorney. [*Id.* at ¶ 29(f)-(g)]. He stated that the individual told him that UpRight Law was nationwide and would find someone for him in his local area. [*Id.* at ¶ 29(h)]. The Debtor testified that he refinanced his home in 2012 with a five year balloon note and, because the mortgage company was not willing to refinance the note in the chapter 13, the Debtors decided to surrender the home and convert to chapter 7. [*Id.* at ¶ 29(a)]. Mrs. Elrod testified that she did not believe UpRight Law adequately represented the Debtors in this case because UpRight Law sent them to an attorney that did not help them. [*Id.* at ¶ 29(p)].

## II.    Jurisdiction

This case and all related proceedings have been referred to this court for decision pursuant to 28 U.S.C. § 157(a) and the Standing Order of the United States District Court, Eastern District of Tennessee, entered July 18, 1984.

As a preliminary matter, Mr. Smith has made a special appearance to move this court to dismiss the complaint against him for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). [Doc. Nos. 19-20]. He argues that he has insufficient contacts with the state of Tennessee to confer personal jurisdiction over him to this court. The Trustee contends that

the court has personal jurisdiction pursuant to Federal Rule of Bankruptcy Procedure 7004(f). [4]

[Doc. No. 23 at 2].

Federal Rule of Bankruptcy Procedure 7012(b) states that Federal Rule of Civil Procedure

12(b) applies to adversary proceedings. *See* Fed. R. Bankr. P. 7012(b). Federal Rule of Civil

Procedure 12(b)(2) allows a party to move to dismiss a complaint for lack of personal jurisdiction.

Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of establishing that personal jurisdiction

exists. *Tipton v. Adkins (In re Tipton)*, 257 B.R. 865, 870 (Bankr. E.D. Tenn. 2000). In the face of

a properly supported motion to dismiss, the plaintiff may not rely only on the pleadings "but must,

by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."

*Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Weller v. Cromwell Oil Co.*,

504 F.2d 927, 929 (6th Cir. 1974)). When presented with a properly supported Rule 12(b)(2)

motion and opposition, "the court has three procedural alternatives: it may decide the motion upon

the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an

evidentiary hearing to resolve any apparent factual questions." *Id.* (citation omitted). In the

absence of an evidentiary hearing, the plaintiff need only make a *prima facie* showing of

jurisdiction, but the court must dismiss the action if the specific facts alleged by the plaintiff

collectively fail to comprise the required *prima facie* case. *CompuServe, Inc. v. Patterson*, 89 F.3d

1257, 1261-62 (6th Cir. 1996).

Mr. Smith argues that the court lacks personal jurisdiction over him because he had

insufficient contacts with the state of Tennessee. [Doc. No. 20, at 5-10]. Citing the minimum

---

4  The Trustee also argues that Mr. Smith waived his personal jurisdiction defense through pleadings made by his
counsel prior to the instant motion. [Doc. No. 23, at 2]. Because the court finds that it has personal jurisdiction
pursuant to Federal Rule of Bankruptcy Procedure 7004(f), it finds it unnecessary to address whether Mr. Smith
waived his personal jurisdiction defense.

contacts standard articulated in *International Shoe v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90

L. Ed. 95 (1945), Mr. Smith contends that his only involvement with the Debtors was "temporary

and transitional." [Doc. No. 20, at 9]. He points out that he had no contact at all with Mrs. Elrod,

and that his contacts with Mr. Elrod were limited to approximately four telephone calls initiated by

Mr. Elrod in Tennessee to UpRight Law in Chicago, Illinois, and "randomly transferred to him

because of his availability."[5]  [*Id.*]. With respect to the state of Tennessee, Mr. Smith contends that

he has never visited Tennessee, never conducted any business in Tennessee outside of his

interaction with the Elrods, does not hold a license or lease property in Tennessee, does not vote or

pay taxes in Tennessee, and has no bank accounts, fiduciary interests, agents for service of process,

offices, or employees in Tennessee. [*Id.*]. The Trustee contends that because Mr. Smith was served

process pursuant to Federal Rule of Bankruptcy Procedure 7004(d), the minimum contacts

standard set forth in *International Shoe* has no applicability. [Doc. No. 23, at 2].

The court agrees with the Trustee. As this court has previously explained, "the minimum

contacts standard articulated in *International Shoe* . . . applies only to the power of state courts and

federal courts sitting in diversity to compel the presence of non-resident defendants through the

forum state long-arm service of process statute." *In re Natco*, Case No. 09-51245, Adv. No.

09-5047, 2009 WL 5101912, at *2 (Bankr. E.D. Tenn. Dec. 17, 2009) (citing *Med. Mut. of Ohio v.

deSoto*, 245 F.3d 561, 567-68 (6th Cir. 2001); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320,

1330 (6th Cir. 1993); *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 824-26 (6th Cir. 1981)). "It

---

5 The court notes that the complaint alleges that the first call by Mr. Elrod to UpRight Law was transferred to Mr.
Smith. [Doc. No. 1, at ¶ 11]. However, the complaint alleges that subsequent calls were made by Mr. Elrod directly to
Mr. Smith in which Mr. Elrod inquired about his assigned attorney's refusal to help and asked questions about his
eligibility to file under chapter 13. [*Id.* at ¶¶ 17, 19]. These calls were placed to Mr. Smith, who handled them even
after Mr. Elrod had spoken to Mr. Laker, an attorney at UpRight Law. [*Id.* at ¶¶ 14, 16].

has no applicability to an action where service of process is effected pursuant to a federal statute which provides for nationwide service of process." *Id.*

Federal Rule of Bankruptcy Procedure 7004(d) authorizes nationwide service of process in the bankruptcy context. ("Nationwide Service of Process. The summons and complaint and all other process except a subpoena may be served anywhere in the United States."). Rule 7004(f) also confers personal jurisdiction over defendants in a bankruptcy action:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of Rule 4 F.R. Civ. P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

Fed. R. Bankr. P. 7004(f).

As this court explained in *In re Tipton*, Rule 7004(f) provides a three part test to determine whether a court has personal jurisdiction over a defendant:

> (1) service of process has been made in accordance with Rule 7004 of the Federal Rules of Bankruptcy Procedure or Fed. R. Civ. P. 4; (2) the action is "a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code"; and (3) "exercise of jurisdiction is consistent with the Constitution and the laws of the United States."

*In re Tipton*, 257 B.R. at 870; *see also In re Natco, Inc.*, 2009 WL 5101912, at *3.

As to the first part of the test, the record reflects that on May 25, 2017, the Plaintiff, through counsel, filed a Certificate of Service evidencing that copies of the Summons and Complaint were served upon Mr. Smith on May 25, 2017, by "Mail Service: Regular, first class United States mail, postage fully pre-paid." [Doc. No. 4]. Mr. Smith has not raised any objection to the sufficiency of service of process. Therefore, the court considers any objection to service to be waived. *See Tipton*, 257 B.R. at 870-71; *see also* Fed. R. Civ. P. 12(h)(1) as incorporated by Fed. R. Bankr. P.

7012(b). Accordingly, the first requirement for the exercise of personal jurisdiction under Rule

7004(f) has been met.

The second requirement under Rule 7004(f) is that the proceeding in which jurisdiction is

sought must be "a case under the Code or a civil proceeding arising under the Code, or arising in or

related to a case under the Code." Fed. R. Bankr. P. 7004(f). As the *Tipton* court noted, "[t]his

language mirrors the grant of subject matter jurisdiction over bankruptcy matters given the district

court in 28 U.S.C. § 1334(a) and (b)." *In re Tipton*, 257 B.R. at 871. "Thus, in order for this court

to exercise personal jurisdiction over the defendants, it must have subject matter jurisdiction over

the action." *Id.*

Section 1334 defines the scope of district court jurisdiction over cases under title 11, and it

provides in part that "the district courts shall have original but not exclusive jurisdiction of all civil

proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §

1334(b). Courts examining section 1334 have concluded that there are four categories of cases

created by the statute: (1) cases under title 11, i.e., the bankruptcy case itself; (2) proceedings

arising under title 11; (3) proceedings arising in a case under title 11; and (4) proceedings related to

a case under title 11. *See In re McKenzie*, 471 B.R. 884, 896 (Bankr. E.D. Tenn. 2012) (citations

omitted). The first three categories are designated as "core proceedings." 28 U.S.C. § 157(b)(1). In

core proceedings, the bankruptcy court may enter appropriate orders and judgments, subject to

review under 28 U.S.C. § 158. *Id.* Section 157(c)(1) allows a bankruptcy judge to hear a

proceeding that is not a core proceeding but is otherwise "related to" a case under title 11. 28

U.S.C. § 157(c)(1). In these cases, in which the matter is deemed "non-core," the bankruptcy judge

is required to submit proposed findings of fact and conclusions of law to the district court for entry

18

of a final order or judgment. *Id.* If all of the parties consent, the bankruptcy judge may hear and

determine the case and enter a final order and judgment subject to review under 28 U.S.C. § 158.

28 U.S.C. § 157(c)(2).

In this case, Plaintiff's causes of action against Mr. Smith relate to his conduct in providing

bankruptcy assistance to the Debtors. That assistance started a relationship between UpRight Law

and the Debtors which led to a bankruptcy proceeding pending in this court. Although the alleged

unauthorized practice of law is based on a state law prohibition, violations of that statute implicate

the administration of cases in this court. The Rules of Professional Conduct of the Supreme Court

of Tennessee have been adopted by this court to the extent that they relate to matters in this court's

jurisdiction. E.D. Tenn. LBR 2090-2. In *In re Rose*, 314 B.R. 663, 683 (E.D. Tenn. 2004), Judge

Stair noted that, "[t]here can be no more fundamental exercise of core subject matter jurisdiction

by the bankruptcy court than its policing of professionals whom debtors pay to render service in

connection with their cases." The court finds that the issues raised are core issues which arise in

this case and over which this court has core jurisdiction.

At a minimum, the court has "related to" jurisdiction. A civil proceeding is "related to" a

bankruptcy case where "the outcome of the proceeding would conceivably have any effect on the

estate being administered in bankruptcy." *Wolverine Radio Co.*, 930 F.2d 1132, 1142 (6th Cir.

1991); *see also Waldman v. Stone*, 698 F.3d 910, 916 (6th Cir. 2012). Any recoveries from the

Trustee's causes of action are assets of the Debtors' bankruptcy estate. 11 U.S.C. § 541(a)(1) (The

"estate is comprised of ... all legal and equitable interests of the debtor in property as of the

commencement of the case."); 11 U.S.C. § 1306(a)(1) ("Property of the estate includes, in addition

to the property specified in section 541 of this title—(1) all property of the kind specified in such

section that the debtor acquires after the commencement of the case but before the case is closed dismissed or converted. ...")). For the foregoing reasons, the court concludes that it has subject matter jurisdiction in this adversary proceeding and that the second requirement for the exercise of personal jurisdiction under section 7004(f) has been met.

The third component of the section 7004(f) test is whether the exercise of personal jurisdiction over the defendant is consistent with "the Constitution and laws of the United States." *In re Tipton*, 257 B.R. at 871; Fed. R. Bankr. P. 7004(f). Mr. Smith does not directly address Rule 7004(f) in his brief but argues that personal jurisdiction would be inconsistent with the "minimum contacts" standard set forth in *International Shoe* because his contacts with the state of Tennessee by way of his telephone calls with Mr. Elrod were "short-term and transitional." [Doc. No. 20, at 10]. However, as this court has previously stated, "[i]n an action where service of process is effected pursuant to a federal statute which provides for nationwide service of process, the strictures of *International Shoe* . . . do not apply." *In re Tipton*, 257 B.R. at 872 (quoting *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d at 1330). Rather, "[w]here a federal statute . . . confers nationwide service of process, 'the question becomes whether the party has sufficient contacts with the United States, not any particular state.'" *Id.*; *see also In re Natco, Inc.*, 2009 WL 5101912, at *5 ("[W]hen nationwide service of process is authorized by a federal statute, the courts look at whether the defendant has minimum contacts with the United States as a whole, not the defendant's contacts with the state in which the federal court sits.") (citing *Med. Mut. of Ohio*, 245 F.3d at 567-68). Rule 7004(d) is a federal statute providing for nationwide service of process; therefore, the minimum contacts test of *International Shoe* does not apply.

In his reply brief, Mr. Smith attempts to distinguish certain Sixth Circuit cases applying a

"national contacts approach" to personal jurisdiction on the basis that the cases arose under the

Employee Retirement Income Security Act ("ERISA") and did not involve a bankruptcy matter.

[Doc. No. 29, at 7 (citing *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561 (6th Cir. 2001); *NGS Am., Inc.*

*v. Jefferson*, 218 F.3d 519 (6th Cir. 2000))]. In *In re Tipton*, this court specifically addressed the

application of Rule 7004 in the context of nationwide service of process and the exercise of

personal jurisdiction over defendants in a bankruptcy adversary proceeding. *In re Tipton*, 257 B.R.

at 872-73 (collecting cases). The court noted that other courts had considered the issue and found

that "Fed. R. Bankr. P. 7004(d) is a constitutional exercise of congressional authority" and that

"there is 'nothing in the Constitution which forbids Congress to enact that a federal trial court shall

have the power to bring before it all the parties necessary to its decision.'" *Id.* at 472 (quoting *Fed.*

*Fountain, Inc. v. KR Entm't (In re Fed. Fountain, Inc.)*, 165 F.3d 600, 602 (8th Cir. 1999)).

At oral argument, Mr. Smith's counsel argued that due process required the court to

consider whether the exercise of personal jurisdiction was "fair and reasonable to the Defendant."

[Argument of Harry R. Cash, Nov. 1, 2017, at 1:48:50]. The requirement of a fairness analysis was

also addressed by the *In re Tipton* court when it noted that, "the fairness that due process of law

requires relates to 'the fairness of the exercise of power by a particular sovereign, . . . and there can

be no question . . . that the defendant . . . has sufficient contacts with the United States to support

the fairness of the exercise of jurisdiction over him by a United States court.'" *Id.* (quoting *In re*

*Fed. Fountain, Inc.*, 165 F.3d at 602).

In this case, Mr. Smith has acknowledged that he is a resident of the state of Illinois. [Doc.

No. 19-1, Ex. A, at 1]. Accordingly, the court concludes that the minimum contacts with the

United States have been established sufficient to confer personal jurisdiction. *See Steed v.*

*Buckalew (In re Rivas)*, Case No. 08-12333, Adv. No. 09-1055, 2009 WL 3493597, at *2 (Bankr.

E.D. Tenn. Oct. 27, 2009). The court will DENY Mr. Smith's motion to dismiss for lack of

personal jurisdiction.

### III.   Analysis

Having found that the court has jurisdiction over the adversary proceeding, the court will

proceed to address the other bases for dismissal raised by Mr. Smith in his motion to dismiss. Mr.

Smith argues that Plaintiff has failed to meet his burden under Federal Rule of Civil Procedure

12(b)(6) to allege sufficient facts to sustain a claim for the unauthorized practice of law or

negligence per se. [Doc. No. 20, at 2-3, 11].

### A.   Standard of Review

Federal Rule of Bankruptcy Procedure 7012(b) states that Federal Rule of Civil Procedure

12(b) applies to adversary proceedings. *See* Fed. R. Bankr. P. 7012(b). Federal Rule of Civil

Procedure 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim upon

which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6), a court must "treat as true all of the well-pleaded

allegations of the complaint." *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996).

In addition, a court must construe all allegations in the light most favorable to the plaintiff. *Id.*

(citing *Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1039 (6th Cir. 1991)).

The Supreme Court has explained "an accepted pleading standard" that "once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1969

(2007). The complaint "must contain either direct or inferential allegations respecting all the

material elements to sustain a recovery under some viable legal theory." *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir. 1993) (quotation omitted).

The court will thus review the motion to dismiss by assuming the facts as alleged by the Plaintiff. In *Twombly* the Supreme Court emphasized that:

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, ... Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

127 S. Ct. at 1964-65 (citations omitted). *See also Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (noting that "[a]lthough for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation").

### B. Count One: Unauthorized Practice of Law, Tenn. Code Ann. § 23-3-103

The Trustee's first claim against Mr. Smith is for the unauthorized practice of law, which is prohibited by Tennessee law by Tennessee Code Annotated § 23-3-101, *et seq.* Specifically, section 23-3-103, provides in pertinent part:

> (a) No person shall engage in the practice of law or do law business, or both, as defined in § 23-3-101, unless the person has been duly licensed and while the person's license is in full force and effect, nor shall any association or corporation engage in the practice of the law or do law business, or both. However, nonresident attorneys associated with attorneys in this state in any case pending in this state who do not practice regularly in this state shall be allowed, as a matter of courtesy, to appear in the case in which they may be thus employed without procuring a license, if properly authorized in accordance with applicable rules of court, and when introduced to the court by a member in good standing of the Tennessee bar, if all the courts of the resident state of the nonresident attorney grant a similar courtesy to attorneys licensed in this state.

Tenn. Code Ann. § 23-3-103(a).

The terms "law business" and the "practice of law" are defined by statute as follows:

As used in this chapter, unless the context otherwise requires:

(1) "Law business" means the advising or counseling for valuable consideration of any person as to any secular law, the drawing or the procuring of or assisting in the drawing for valuable consideration of any paper, document or instrument affecting or relating to secular rights, the doing of any act for valuable consideration in a representative capacity, obtaining or tending to secure for any person any property or property rights whatsoever, or the soliciting of clients directly or indirectly to provide such services;
. . .

(3) "Practice of law" means the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies, or the soliciting of clients directly or indirectly to provide such services.

Tenn. Code Ann. § 23-3-101.

Tennessee provides a private cause of action for "[a]ny person who suffers a loss of money or property, real, personal or mixed, or any other article, commodity or thing of value wherever situated, as a result of an action or conduct by any person that is declared to be unlawful under § 23-3-103, § 23-3-104 or § 23-3-108." Tenn. Code Ann. § 23-3-112(a)(1). That person "may bring an action to recover an amount equal to the sum of treble any actual damages sustained by the person and treble any amount paid by the person, and may be afforded such other relief as the court considers necessary and proper." *Id.* "The courts are authorized to issue orders and injunctions to restrain, prevent and remedy violations of this chapter, and the orders and injunctions shall be issued without bond." Tenn. Code Ann. § 23-3-103(c)(3).

Mr. Smith argues that the proper focus of an unauthorized practice of law claim is "whether there is a 'rendition of services for others that call for the professional judgment of a lawyer.'"

24

[Doc. No. 20, at 12 (quoting *In re Petition of Burson*, 909 S.W.2d 768, 776-77 (Tenn. 1995)]. He argues that information gathering sessions or activities that do not require legal training, skill, or judgment are not the practice of law or the doing of law business. *Id.* Mr. Smith characterizes his acts as falling under the umbrella of activities that do not require legal training, skill, or judgment.

In his complaint, the Trustee identified several objectionable activities that he alleges constitute the unauthorized practice of law. Those activities supported by the allegations of statements made by Mr. Smith include: (1) negotiating the fee for the representation of the Elrods [Doc. No. 1, at ¶ 12(d)]; (2) advising the Elrods as to what chapter of the Bankruptcy Code under which they should seek relief [*Id.* at ¶ 12(c)]; (3) advising the Elrods that they could not regain possession of the Jeep that had been repossessed from them because ten days had expired since the repossession [*Id.* at ¶ 12(l)]; (4) advising the Elrods what the amount of their chapter 13 payment would be [*Id.* at ¶ 12(j)]; (5) advising the Elrods not to pay $1,000 to their mortgage company to stop the pending foreclosure [*Id.* at ¶ 12(i)]; (6) advising the Elrods that their house was not up for sale [*Id.*]; and (7) advising the Elrods how long the bankruptcy would stay on their credit report [*Id.* at ¶ 12(s)].

The Trustee also identified several objectionable activities that he alleges constitute the unauthorized doing of law business. These activities described specifically in the complaint include: (1) directly soliciting the Elrods to file bankruptcy through UpRight Law by negotiating the fee for their representation [*Id.* at ¶¶ 12(d), 19]; (2) directly soliciting the Elrods to file bankruptcy through UpRight Law by advising them as to what chapter of the Bankruptcy Code under which they should seek relief [*Id.* at ¶¶ 12(c), 17]; (3) directly soliciting the Elrods to file bankruptcy through UpRight Law by advising them that they could not regain possession of the

Jeep that had been repossessed from them because ten days had expired since the repossession [*Id.* at ¶ 12(l)]; (4) directly soliciting the Elrods to file bankruptcy through UpRight Law by advising them what the amount of their chapter 13 payment would be [*Id.* at ¶ 12(j)]; (5) directly soliciting the Elrods to file bankruptcy through UpRight Law by advising them not to pay $1,000 to their mortgage company to stop the pending foreclosure [*Id.* at ¶ 12(i)]; (6) directly soliciting the Elrods to file bankruptcy through UpRight Law by advising them that their house was not up for sale [*Id.*].

The complaint contains detailed factual allegations regarding the statements made by Mr. Smith to Mr. Elrod that are plausibly characterized as advice and solicitation to provide services and could be interpreted as more than simply gathering information. For example, Mr. Smith's questions about Mr. Elrod's debts may constitute gathering information. [Doc. No. 1, at ¶ 12(g)-(h)]. However, responding to his question about curing the mortgage default by saying that "there is no point in paying the past due amount" and that he would have to file a chapter 13 because real property taxes were owed can plausibly be seen as giving advice. [*Id.* at ¶ 12(i)]. Such an evaluation of the course the caller should pursue would require knowledge of the terms of the note, the default and cure provisions of the deed of trust, the adequacy of the default notice, the comparative benefits and limitations of the automatic stay, and the extent and applicability of cure provisions in the Bankruptcy Code. Another example of information conveyed by Mr. Smith that involves some legal training, skill, or judgment is the calculation of the chapter 13 payment amount. [*Id.* at ¶ 12(j)]. Conveying that a chapter 13 requires regular payments may be providing information, but stating that the monthly payment will be a specific amount requires an analysis of the debtor's disposable income, the applicable commitment period, and the requirements of sections 1322 and 1325. In response to a question about whether Mr. Elrod could recover his Jeep

26

from a repossessing creditor, the complaint alleges that Mr. Smith inquired about how long it had been repossessed and then opined that recovery was impossible in Tennessee after ten days. [*Id.* at ¶ 12(l)]. To respond to such a question, an attorney would need to know the terms of the security agreement; the contents of the default notice; the relevant Tennessee statutory provisions on secured transactions related to default, repossession, redemption, and notice of disposition; and the requirements for a commercially reasonable sale.

The court concludes that the complaint contains sufficient allegations to plausibly state a claim that Mr. Smith was doing more than merely gathering the information needed to complete a petition and provide general bankruptcy information about the process. The allegations, viewed in the light most favorable to the Plaintiff, show Mr. Smith responding to legal questions posed by Mr. Elrod and soliciting legal business from the Elrods. There may be additional information Mr. Smith can provide that will prove to be a defense to these claims, but the allegations are sufficient to state a claim.

Mr. Smith also argues that there are no factual allegations showing that his actions caused the loss of the Debtors' house and Jeep. He points to the intervening advice of Ms. Gillespie and the Debtors' decision to convert to a chapter 7 liquidation as evidence that retention of the house and Jeep were never a possibility for these Debtors. The court acknowledges that causation is the weakest part of the Trustee's case based on the facts as they are alleged. Nevertheless, the Trustee has alleged that incorrect legal advice was given, that alternative legal actions were not taken based on that advice, and that taking such actions would have produced different results. These allegations, along with the reasonable inferences to be drawn from them, sufficiently state a causal connection.

For the foregoing reasons, the court concludes that sufficient allegations have been made to state a claim against Mr. Smith for the unauthorized practice of law. Accordingly, the court will DENY Mr. Smith's motion to dismiss Count I.

### C. Count Two: Negligence Per Se

Finally, Mr. Smith argues that the Trustee has failed to state a claim for negligence per se. [Doc. No. 20, at 17]. The Tennessee Supreme Court has summarized the doctrine of negligence per se as follows:

> The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se. "When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard of care ... from which it is negligence to deviate." *Prosser and Keeton on Torts* § 36, p. 220 (5th ed. 1984). In order to establish negligence per se, it must be shown that the statute violated was designed to impose a duty or prohibit an act for the benefit of a person or the public. It must also be established that the injured party was within the class of persons that the statute was meant to protect.

*Whaley v. Perkins*, 197 S.W.3d 665, 672 (Tenn. 2006) (quoting *Cook By and Through Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)). Mr. Smith argues that the complaint fails to satisfy the two threshold questions of "(1) whether the plaintiff belongs to the class of persons that the statute was designed to protect; and (2) whether the plaintiff's injury is of the type that the statute was designed to prevent." [Doc. No. 20, at 18 (citing *Whaley*, 197 S.W. 3d at 673)].

The statute in question provides that individuals who provide legal advice to the citizens of this state must be licensed. Tenn. Code Ann. § 23-3-103(a) ("No person shall engage in the practice of law or do law business . . . unless the person has been duly licensed and while the person's license is in full force and effect. . . ."). Licensing requires the successful completion of a course of education, successful completion of a bar examination, and admission to the bar

28

following an interview and submission of references. *See* Tenn. Code Ann. § 23-1-108; Tenn. Sup.

Ct. R. 6, 7. Bar admission also requires consent to conform to the Rules of Professional Conduct

which require a duty of loyalty and competency. Tenn. Sup. Ct. R. 8, RPC 1.1, 1.7, 8.4.

"[T]he purpose of the statutory prohibition against the unauthorized practice of law

protects the public by ensuring that the public receives high quality legal services." *Fifteenth*

*Judicial Dist. Unified Bar Ass'n v. Glasgow*, No. M1996-00020-COA-R3-CV, 1999 WL 1128847,

at *6 (Tenn. Ct. App. Dec. 10, 1999) (citing *In re Petition of Burson,* 909 S.W.2d at 776-77;

*Haverty Furniture Co. v. Foust,* 174 Tenn. 203, 210, 124 S.W.2d 694, 697 (1939)); *see also Elm*

*Children's Educ. Trust v. Wells Fargo Bank*, 468 S.W.3d 529, 532 (Tenn. Ct. App. 2014)

("The  purpose of our statutes regulating the practice of law is to prevent the public's being preyed

upon by those who, for valuable consideration, seek to perform services which require skill,

training and character, without adequate qualifications.") (citations omitted).

The court concludes that the complaint plausibly alleges that the Plaintiff belongs to the

class of persons that the statute was designed to protect and that the Plaintiff's injury is of the type

that the statute was designed to prevent. The Debtors are squarely in the class of persons that the

unauthorized practice of law statute was designed to protect. To the extent that Mr. Smith's

argument is that the Trustee, who is the named plaintiff in this case, does not belong to this

protected class, the court notes that the Trustee is the successor in interest to the Debtors' causes of

action under 11 U.S.C. §§ 323(a)-(b) and 704(a). As such he may stand in the shoes of the Debtors

to pursue this action. *See Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)*, 834 F.3d 651, 675 (6th

Cir. Aug. 23, 2016) ("A 'trustee stands in the shoes of the debtor and has standing to bring any

action that the bankrupt could have brought had he not filed a petition for bankruptcy.'") (quoting

29

*Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir. 2002)). Moreover, the injury alleged is precisely the type of harm that the statute was designed to prevent. The complaint alleges that, without meeting any of the requirements for practicing law, Mr. Smith offered legal advice to the Debtors and advised them to make choices that resulted in the loss of their home and vehicle.

For the foregoing reasons, the court finds that the Trustee has stated a cause of action for negligence per se and will DENY Mr. Smith's motion to dismiss Count II.

## IV.    Conclusion

Based on the foregoing, the court will DENY the motion to dismiss filed by Mr. Smith. [Doc. No. 19]. The court concludes that it has personal jurisdiction over Mr. Smith and that the Trustee has sufficiently pleaded factual allegations to sustain a claim for the unauthorized practice of law and negligence per se. A separate order will enter.

# # #